### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) 2:19-cr-00157-JDL |
| | ) |
| TORRIE MCINTOSH-FIGUEROA, | ) |
| | ) |
| Defendant. | ) |

### ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Torrie McIntosh-Figueroa stands indicted of one count of possession of a controlled substance with intent to distribute in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(C) (West 2020). McIntosh-Figueroa has moved to suppress the introduction at trial of all evidence obtained during and following his detention and interrogation by agents of the Maine Drug Enforcement Agency (MDEA) on January 15, 2019 (ECF No. 23). On December 9, 2020, with McIntosh-Figueroa's consent, I conducted an evidentiary hearing by videoconference (ECF No. 62). For the reasons that follow, I grant the motion in part and deny it in part.

### I. FACTUAL BACKGROUND

#### A.    November 2018 Investigation and Arrest

In the autumn of 2018, MDEA agents began an investigation into drug trafficking in Maine conducted by an individual known as "Dot Scarfo," who was referred to throughout the investigation as "Dot." The agents obtained Dot's phone number and Facebook profile from a confidential source, and in November 2018, Agent Chad Carleton, acting in an undercover capacity, called Dot and proposed that

Dot come to Belfast to stay at a house he would provide for him to sell heroin fentanyl and cocaine base.  Dot agreed, and Agent Carleton arranged to meet him at a Reny's parking lot in Belfast on November 20, 2018.  When Dot arrived at the parking lot, in a car with three other individuals, MDEA agents approached and stopped the car, and Agent Carleton recognized Dot from a photo on Dot's Facebook page.  Agent Jason Verrill also participated in the stop.  In the arrest that followed, Dot was identified as McIntosh-Figueroa.  However, no drugs were discovered, and after being interrogated, McIntosh-Figueroa was released without being charged.  The agents subsequently learned that McIntosh-Figueroa was on Maine state probation with conditions permitting law enforcement to search him for illegal drugs at any time.

### B.      January 2019 Investigation and Surveillance

On January 12, 2019, another confidential source known to Agent Carleton informed him that a man from out of state would be arriving in Brunswick to sell drugs.  The source reported that the man would be staying at an apartment in Brunswick (the "Brunswick Apartment").  Later that night, the source told Agent Carleton that the man had gone to a residence in Gray to package drugs, and would then go to the Brunswick Apartment.

On January 14, MDEA agents conducted surveillance at the Brunswick Apartment.  Later that day, they spotted a Toyota Prius, known to belong to a person associated with drug trafficking, near the Brunswick Apartment.  Agent Ted Raedel and another agent followed the Prius to a state probation office in Waterville, where they observed a man step out of the vehicle and enter the probation office.  By contacting Maine probation officers, the agents were able to confirm that the man

2

was McIntosh-Figueroa.  After McIntosh-Figueroa got back in the Prius, the agents continued to tail the car to a residence in Freeport (the "Freeport House").

The next day, January 15, Agents Carleton, Verrill, and Raedel continued to monitor the Brunswick Apartment and the Freeport House.  They saw three people—one woman and one man that the agents knew to be associated with drug trafficking in the Brunswick area, and another woman unknown to the agents—get into the Prius near the Brunswick Apartment, and followed the Prius to downtown Brunswick, where one of the women was dropped off.  The agents, who all drove separate vehicles, continued to track the car to the Freeport House, where it stopped briefly, and then to a gas station in Freeport, where they could discern a third person in the back seat; they suspected that it was McIntosh-Figueroa and that he had been picked up at the Freeport House.

After leaving the gas station, the agents followed the Prius to an intersection in Gray, where McIntosh-Figueroa got out and began walking.  Drug traffickers often request to be dropped off near, but not directly in front of, their destination so that their driver and other passengers do not learn their precise destination.  Agent Raedel recognized McIntosh-Figueroa's clothing from tailing him the previous day; Agent Verrill recognized his jacket from their encounter the previous November; and Agent Carleton passed close enough to see McIntosh-Figueroa's face.  The agents suspected that McIntosh-Figueroa was in Gray to pick up drugs, but were concerned about stopping him before he accomplished that task.  Thus, the agents did not follow McIntosh-Figueroa to the doorstep of his destination, but instead shadowed the Prius, which parked at a nearby gas station.

3

C.    **The Arrest**

After a period of time, during which the agents conferred and formulated a plan to stop the Prius, the Prius returned to the intersection where McIntosh-Figueroa had gotten out; the agents took up positions nearby.  McIntosh-Figueroa reappeared on foot and got in the Prius's backseat, and the agents surrounded the car.  Agent Verrill opened the rear passenger door, pulled McIntosh-Figueroa out of the car and into a snowbank, and handcuffed him.

Agent Carleton searched McIntosh-Figueroa's outer layers of clothing and pockets and did not find any contraband, but did not conduct a more intrusive search or require McIntosh-Figueroa to remove any clothing because of the public setting. Agent Carleton placed McIntosh-Figueroa in the front passenger seat of his car and read him *Miranda* warnings from a printed card.  McIntosh-Figueroa indicated that he understood the *Miranda* warnings and Agent Carleton began to interrogate him. McIntosh-Figueroa appeared frustrated and said that he did not "want to answer any more questions."  Tr. at 48.  Nevertheless, Agent Carleton continued to engage in light conversation with him in the hopes that McIntosh-Figueroa would reveal some incriminatory information.  For instance, McIntosh-Figueroa told Agent Carleton that he recognized Agent Verrill from the November incident in Belfast.  After Agent Carleton explained that he had been the one to call McIntosh-Figueroa in November, McIntosh-Figueroa mocked Agent Carleton's undercover performance.  Agent Carleton also told McIntosh-Figueroa that the agents were going to search him more thoroughly when they returned to the Brunswick police station.  Although there were

4

several periods of silence during the approximately two hours that they sat together in the car, both parties broke the silence at least once.

During the two hours that Agent Carleton was with McIntosh-Figueroa at the scene, the other agents searched the Prius and the snowbank.  They also spoke with and searched the two other people who had been in the Prius: Agent Verrill primarily interrogated the female passenger and Agent Raedel the male driver.  In the woman's jacket, Agent Verrill found two pipes, a glass jar containing what appeared to be crystal methamphetamine, and a plastic baggie containing twenty pills.  After being read *Miranda* warnings—and about ten minutes after the agents initially stopped the car—the woman told Agent Verrill that after they picked up McIntosh-Figueroa in Freeport, he had handed her a different plastic baggie containing heroin and told her to give it back to him when they arrived in Gray.  The woman also told Agent Verrill that they had come to Gray so that McIntosh-Figueroa could pick up additional drugs.  In a separate conversation, the male driver told Agent Verrill that he was surprised the agents had not yet found drugs on McIntosh-Figueroa, and suggested that the agents check his pants.

## D.    Interrogation at the Police Station

About two hours after the initial stop, Agent Carleton drove McIntosh-Figueroa—still handcuffed—to the Brunswick Police Department, where he was booked and placed in a holding cell.  In the holding cell, Agents Carleton and Verrill again searched McIntosh-Figueroa and had him remove his outer articles of clothing, but did not re-*Mirandize* him.  During this time, McIntosh-Figueroa and the agents continued to speak: McIntosh-Figueroa repeatedly asked the agents, "what do [you]

5

want?"; the agents told him that they wanted "the truth," and that they believed he was concealing drugs. Tr. at 57-58. Eventually, McIntosh-Figueroa reached into his pants, removed a knotted plastic bag, and tossed the bag onto the floor of the holding cell, where the agents retrieved it. The knotted plastic bag comprised a number of smaller baggies containing cocaine and a mixture of heroin and fentanyl.

## II.  LEGAL ANALYSIS

McIntosh-Figueroa makes two challenges to the detention and interrogation that culminated in his producing the drugs. First, he argues that the agents did not have probable cause to arrest him after the initial, fruitless search when they stopped the Prius, and that his two-and-a-half-hour detention was therefore unreasonable. Second, he argues that the agents violated his Fifth Amendment rights by continuing to question him after he invoked *Miranda*, and that the drugs he produced in response to those questions must therefore be suppressed.

## A.    Duration of Detention

McIntosh-Figueroa first contends that the agents violated his Fourth Amendment rights by detaining him after their initial search of his person, and that the length of that detention was unreasonable under *Terry v. Ohio*, 392 U.S. 1 (1968), and *Rodriguez v. United States*, 575 U.S. 348 (2015). The law is well settled that the duration of an investigatory *Terry* stop, which allows police to briefly detain an individual "based on a reasonable suspicion that criminal activity may be afoot"—but does not require probable cause—must be tailored to the investigative purpose of the stop. *United States v. Pontoo*, 666 F.3d 20, 27, 30 (1st Cir. 2011); *see United States v. Sharpe*, 470 U.S. 675, 685-86 (1985). If the stop is too long or intrusive and the police

do not have probable cause, an otherwise valid *Terry* stop may become an invalid "de facto arrest." *Pontoo*, 666 F.3d at 30.

However, *Terry* applies only when the police lack probable cause; by contrast, "[w]hen there is probable cause . . . , the Fourth Amendment's prohibition against unreasonable searches and seizures is not offended" by an arrest. *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 9 (1st Cir. 2004). Thus, if probable cause existed to believe that McIntosh-Figueroa had committed a crime, it does not matter whether his detention may have exceeded *Terry*'s limits. Additionally, if probable cause exists, then an officer's subjective intent to effect a more limited *Terry*-style detention is immaterial: "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Probable cause for an arrest exists "when, at the time of the arrest, the 'facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009) (alteration omitted) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "The question of probable cause . . . is an objective inquiry," *id.*, and "does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable," *id.* (quoting *Acosta*, 386 F.3d at 11). Additionally, when

7

determining whether probable cause exists, courts "look to the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer." *United States v. Azor*, 881 F.3d 1, 8 (1st Cir. 2017) (citing *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983)).

By the time the agents stopped the Prius, the sum of their collective knowledge about McIntosh-Figueroa gave them probable cause to arrest him for drug trafficking. Two months earlier, Agent Carleton had arranged to buy drugs from McIntosh-Figueroa, and although he did not know McIntosh-Figueroa's real name during that phone call, McIntosh-Figueroa implicitly acknowledged being the same person during the January 15 interrogation in Agent Carleton's car when he mocked the agent's undercover performance.  Additionally, although the agents did not arrest McIntosh-Figueroa in November, nothing about that incident was inconsistent with McIntosh-Figueroa dealing in illegal drugs.

When McIntosh-Figueroa resurfaced in January, an informant, whose identity and source of information was known to the agents, told them that McIntosh-Figueroa was coming to Maine specifically to sell drugs.  Additionally, the movements and activities that the agents observed during their day-and-a-half of monitoring him—the circuitous movements and shuttling back and forth between certain residences; the identities of the people interacting with and ferrying McIntosh-Figueroa; the fact that he was never dropped off directly in front of his apparent destination in Gray—were completely consistent with that information.  Especially against the backdrop of the agents' previous encounter with McIntosh-Figueroa in

November, it was reasonable for them to believe that it was at least probable that McIntosh-Figueroa had committed and was committing a drug-related crime when they stopped him in Gray.  The fact that the agents did not discover drugs when they initially searched him did not void probable cause: It was January, McIntosh-Figueroa was wearing multiple layers of clothing, they were in public, and the agents were intentionally waiting until they returned to the police station to conduct a more thorough search.

Although I conclude that the agents had probable cause to arrest McIntosh-Figueroa at the time of the stop, any question about probable cause was erased within ten minutes or so of the initial stop, when the woman passenger told Agent Verrill that McIntosh-Figueroa had given her drugs to hold for him during the car trip. Moreover, the fact that Agent Carleton did not characterize the detention as an arrest—at two hours, it clearly exceeded *Terry*'s limits—does not invalidate his actions; viewed objectively, he had the authority to arrest McIntosh-Figueroa.

Because the police had probable cause to arrest McIntosh-Figueroa, they did not violate his Fourth Amendment rights when they detained him for two hours at the scene of the arrest.

## B.   *Miranda* **Violation**

McIntosh-Figueroa also argues that the drugs should be suppressed because they were obtained in violation of the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966).  He contends that after he unambiguously invoked his right to remain silent, Agents Carleton and Verrill continued to interrogate him, and that his act of producing the drugs was a "statement" in response to their questions; however,

McIntosh-Figueroa does not suggest that his conduct at the police station was involuntary or actually coerced.  The Government argues that McIntosh-Figueroa reinitiated the conversation and resulting questioning at the police station and that the act of producing the drugs was not a statement for *Miranda* purposes.

After Agent Carleton read McIntosh-Figueroa the *Miranda* warnings in the front seat of the car, McIntosh-Figueroa stated that he did not want to answer questions.[1]  "Where a suspect asserts his right to counsel or to remain silent, further interrogation may not take place 'unless the accused himself initiates further communication, exchanges, or conversations with the police.'"  *United States v. Thongsophaporn*, 503 F.3d 51, 55-56 (1st Cir. 2007) (quoting *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)).  "The 'admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his right to cut off questioning was scrupulously honored,'" *id.* at 56 (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)), a question that requires a court to consider the "totality of the circumstances," *id.* (quoting *United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992)).  The First Circuit has identified several factors that may be particularly salient to this analysis: "(1) whether a reasonable period of time passed prior to the resumption [of questioning], (2) whether the same officer resumed questioning, (3) whether the suspect received refreshed *Miranda* warnings, and (4) whether questioning concerned the same alleged crime." *United States v. Oquendo-Rivas*, 750 F.3d 12, 17-18 (1st Cir. 2014).

---

[1] The Government does not dispute that McIntosh-Figueroa unambiguously invoked his right to remain silent at least once. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

McIntosh-Figueroa's decision to remain silent was not scrupulously honored. During the interrogation in the car, Agent Carleton—the same officer who had informed McIntosh-Figueroa of his right to remain silent, and to whom McIntosh-Figueroa had invoked that right—repeatedly violated that invocation by attempting to get McIntosh-Figueroa to talk.  The ensuing conversation was, in effect, an interrogation, and although it occasionally lapsed into silence, it was largely sustained. Agent Carleton conducted the interrogation without re-*Mirandizing* McIntosh-Figueroa.  Additionally, the Government has not offered any reason, other than interrogation, that Agent Carleton had to stay in the car with McIntosh-Figueroa (who was, after all, in handcuffs). Under the circumstances, Agent Carleton's conduct and continuous presence in the car could only have conveyed to McIntosh-Figueroa that he was expected to talk.  Moreover, the substance of the conversation was plainly investigative.  Although some of Agent Carleton's questions were not expressly about McIntosh-Figueroa's activities, the entire conversation was aimed at "elicit[ing] an incriminating response" from him. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  Once McIntosh-Figueroa invoked his right to remain silent, the conversation should have ceased.

The Government also argues that, even if McIntosh-Figueroa's invocation of his right to remain silent in the car was not honored, it was ultimately McIntosh-Figueroa who reinitiated the conversation at the police station by asking the agents, "What do you want?"  But even if this phrase could constitute a suspect's reinitiation of the interrogation under the law, *see Thongsophaporn*, 503 F.3d at 56, the reinitiation exception "applies only where law enforcement has complied with its

11

obligation under *Miranda* to scrupulously honor the defendant's right to remain silent." *United States v. Lara Lara*, 440 F. Supp. 3d 64, 71 (D. Mass. 2020); *see Barone*, 968 F.2d at 1384 ("[A] court need determine specifically whether there has been a voluntary waiver [of *Miranda* rights] only after the government has carried its burden of showing that it complied with the required procedures.").

As I have described, McIntosh-Figueroa's invocation of his right to remain silent was not scrupulously honored. He did not spontaneously decide that he wanted to talk; instead, he was responding to what he would have perceived as the agents' refusal to allow him to remain silent. I therefore conclude that any statements that McIntosh-Figueroa made during the course of that conversation—from the first time he invoked his right to remain silent during the initial interrogation, through the events in the holding cell—were obtained in violation of *Miranda* and the Fifth Amendment and must be suppressed.[2] These statements include McIntosh-Figueroa's act of producing the drugs in response to the agents' exhortations that he tell the truth, because that act was communicative and testimonial in every meaningful sense. *See Pennsylvania v. Muniz*, 496 U.S. 582, 595-96 (1990).

However, the *Miranda* violation does not require suppressing the physical evidence that is the main target of McIntosh-Figueroa's motion: the drugs that he possessed while at the police station. "The Supreme Court has held that physical evidence need not be excluded simply because it is discovered as a result of unwarned

---

[2] McIntosh-Figueroa does not identify any specific, incriminatory verbal statements that he views as requiring suppression—nor does the Government suggest that it will introduce any at trial—but I address this category in the interest of thoroughness.

questioning in violation of *Miranda*." *United States v. Jackson*, 544 F.3d 351, 361 (1st Cir. 2008) (citing *United States v. Patane*, 542 U.S. 630, 634, 637-44 (2004) (Thomas, J., plurality); *id.* at 644-45 (Kennedy, J., concurring in judgment)).   In *Patane*, the Supreme Court considered the question of "whether a failure to give a suspect [*Miranda*] warnings . . . requires suppression of the physical fruits of the suspect's unwarned but voluntary statements."   542 U.S. at 633-634 (Thomas, J., plurality).   A fractured majority of the Court concluded that the answer is no, and held—albeit it for two different reasons—that the exclusionary rule does not apply to "nontestimonial fruit of a voluntary statement" even if the statement is made after a *Miranda* violation.   *Id.* at 643; *see id.* at 645 (Kennedy, J., concurring) ("Admission of nontestimonial physical fruits . . . does not run the risk of admitting into trial an accused's coerced incriminating statements against himself.").

Thus, although McIntosh-Figueroa's verbal statements and physical production of the drugs in response to exhortations to tell the truth are suppressed, the drugs themselves are not testimonial and need not be suppressed.   *See id.* at 643 (Thomas, J., plurality); *id.* at 645 (Kennedy, J., concurring).   Similarly, testimony about the drugs' characteristics as physical property—including that the drugs were hidden on McIntosh-Figueroa's person and discovered after he had been placed in a holding cell at the police station—will not risk introducing any of McIntosh-Figueroa's unwarned statements.

And importantly, McIntosh-Figueroa does not contend, nor does the evidence show, that this act or any of his other statements were coerced or involuntary, in which case the physical fruits of those statements would be suppressed.   *See Patane*,

542 U.S. at 637, 644 (Thomas, J., plurality) (noting that "the exclusion of the physical fruit of actually coerced statements" is required); *see also Chavez v. Martinez*, 538 U.S. 760,769 (2003) ("[T]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." (emphasis in original)). Rather, he challenges the drugs only as the fruit of a statement made in violation of *Miranda. Patane* therefore controls, and McIntosh-Figueroa's argument that the drugs should be suppressed as evidence against him because of the *Miranda* violation is unavailing.

Finally, I note that the inevitable discovery exception to the exclusionary rule also permits the admission of the drugs at trial. The inevitable discovery doctrine applies when three requirements are met: (1) "the legal means by which the evidence would have been discovered was truly independent," (2) "the use of the legal means would have inevitably led to the discovery of the evidence," and (3) "applying the inevitable discovery rule would [not] either provide an incentive for police misconduct or significantly weaken constitutional protections." *United States v. Almeida*, 434 F.3d 25, 28 (1st Cir. 2006).

The rule's application to this case is straightforward. First, as I have already discussed, the agents had probable cause, and had essentially resolved, to arrest and search McIntosh-Figueroa before they even stopped the Prius, and none of McIntosh-Figueroa's statements to Agent Carleton would have affected the agents' decision-making whatsoever. The agents would have independently discovered the drugs pursuant to that lawful arrest, and lawful search incident to arrest, at the police

14

station.  Second, the drugs would inevitably have been discovered during the course of that search—indeed, the agents had already been told by the male driver that they should check McIntosh-Figueroa's pants.  Third, applying the inevitable discovery rule to this case will not affect police incentives or weaken constitutional protections: as this arrest and interrogation unfolded, the police misconduct and *Miranda* violation was, for all practical purposes, completely separate from the lawful procedure that would inevitably have culminated in the drugs' discovery.  In short, if the police had followed *Miranda* to the letter and honored McIntosh-Figueroa's assertion of his right to remain silent, they would still have arrested and searched him, and that search would have led to the discovery of the drugs.

## III.  CONCLUSION

For the foregoing reasons, McIntosh-Figueroa's Motion to Suppress Evidence (ECF No. 23) is **GRANTED IN PART** as to any statements he made after saying that he wished to remain silent—including his act of producing the drugs—and otherwise **DENIED** in all other respects, including as to the drugs themselves.

**SO ORDERED.**

**Dated this 12th day of January, 2021**

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**